Filed 7/30/21

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| MICHAEL BERG et al., | C086890 |
| Plaintiffs, | (Super. Ct. Nos. STKCVUCD20130000686, 39201300292458CUCDSTK) |
| v. | |
| PULTE HOME CORPORATION, | |
| Defendant; | |
| ST. PAUL MERCURY INSURANCE COMPANY, | |
| Intervener and Appellant; | |
| COLORIFIC PAINTING, INC., et al., | |
| Interveners and Respondents. | |

---

[*] Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts II through IV of the Discussion.

1

APPEAL from a judgment of the Superior Court of San Joaquin County, Kronlund, Judge. Affirmed.

The Aguilera Law Group, APLC, A. Eric Aguilera and Raymond E. Brown for Intervener and Appellant.

Nicolaides Fink Thorpe Michaelides Sullivan LLP, Jeffrey N. Labovitch, Jodi S. Green, and Kimberly A. Hartman for Interveners and Respondents.

This equitable subrogation action arises out of a residential construction defect lawsuit filed by several homeowners against Pulte Home Corporation (Pulte). The homeowners sued Pulte for allegedly violating building standards set forth in Civil Code[1] section 896, breach of contract, and breach of express warranty pertaining to 13 homes (the *Berg* litigation). St. Paul Mercury Insurance Company (St. Paul) defended Pulte in the *Berg* litigation as an additional insured under a general liability policy issued to St. Paul's named insured and one of Pulte's subcontractors, Groundbreakers Landscaping, Inc.

Pertinent to this appeal, St. Paul later sued three of Pulte's subcontractors -- Vaca Valley Roofing, Inc., Norman Masonry, Inc., and Colorific Painting, Inc. (collectively defendants) -- for equitable subrogation through a complaint in intervention in the *Berg* litigation. In essence, St. Paul sought to pursue Pulte's breach of contract claims against defendants for their failure to defend Pulte in the *Berg* litigation. Standing in Pulte's shoes, St. Paul asserted defendants were jointly and severally liable for the reimbursement of the money it expended in defending Pulte, which totaled $193,137.68.

The resolution of the equitable subrogation claim proceeded in three phases. First, the trial court conducted a bench trial to determine whether St. Paul was entitled to equitable subrogation; it found St. Paul had proven the eight elements necessary to entitle it to relief. The second phase "consisted of a jury trial regarding the amount of St. Paul's recoverable damages against each defendant in intervention." The jury returned a verdict

---

[1] All further section references are to the Civil Code unless otherwise specified.

2

in favor of St. Paul and specified the amount of damages for which each defendant was liable under its agreement with Pulte. In the last phase of the proceeding, the trial court reduced the damages awarded by the jury to account for setoffs and/or credits for prior settlements. The trial court then entered judgment awarding St. Paul $4,217.82 against Vaca Valley Roofing, Inc.; $2,100.11 against Norman Masonry, Inc.; and $3,121.02 against Colorific Painting, Inc.

St. Paul raises four arguments on appeal: (1) the trial court erred in granting defendants' request for a jury trial; (2) the trial court erred by failing to instruct the jury that defendants are jointly and severally liable for the mixed defense fees (i.e., attorney fees and costs incurred in defense of the entire *Berg* litigation, such as attending status conferences or mediations; in other words, tasks unrelated to the defense of a subcontractor's specific scope of work); (3) the trial court erred in denying St. Paul's motion for prejudgment interest; and (4) the trial court erred in denying St. Paul's request for attorney fees in prosecuting the equitable subrogation action.

As to the jury trial right contention, we conclude a defendant is entitled to a jury trial on the legal claims pursued against the defendant by an insurer standing in the shoes of its insured, after an insurer's equitable subrogation entitlement has been adjudicated in the insurer's favor by the trial court sitting in equity. We thus disagree with *Pulte Home Corp. v. CBR Electric, Inc.* (2020) 50 Cal.App.5th 216 (*CBR Electric*), which concluded otherwise. We agree, however, with the joint and several liability analysis in *CBR Electric* and *Carter v. Pulte Home Corp.* (2020) 52 Cal.App.5th 571, which agreed with *CBR Electric*. Both the *CBR Electric* and *Carter* courts concluded that Pulte's standard duty to defend and indemnify language in its master agreement (at issue there and here) does not support St. Paul's position on joint and several liability. (*CBR Electric*, at p. 224; *Carter*, at pp. 586-587.) We conclude the same and find St. Paul's arguments to the contrary unpersuasive.

3

As to the prejudgment interest argument, we disagree with St. Paul's view that the damages were a matter of mere calculation. As we explain, the damages were not certain or capable of calculation until the jury determined the appropriate allocation of each defendant's share of the defense fees and costs paid by St. Paul in the *Berg* litigation.

Finally, we find no merit in St. Paul's attorney fees argument. We conclude the attorney fee provision upon which St. Paul relies is ambiguous as to whether the parties intended for it to apply in the type of enforcement proceeding at issue in this appeal. The attorney fees provision must thus be read against the drafter and indemnitee, Pulte. As such, St. Paul (standing in the shoes of Pulte) is not entitled to attorney fees under the master agreements in this enforcement action. Having disagreed with all of St. Paul's arguments, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

The general factual and procedural background is outlined here; additional facts pertinent to the issues are set forth in the Discussion *post*. A significant portion of the following facts were taken from the undisputed facts set forth in the judgment and the exhibits attached thereto, including the statement of decision incorporated by reference.

Each of the defendants respectively entered into a master agreement with Pulte, wherein each agreed to, among other things, indemnify and defend Pulte against "all liability, claims, judgments, suits, or demands for damages to persons or property arising out of, resulting from, or relating to [that defendant's] performance of the work under th[e] Agreement and any Contractor Project Agreement ('Claims') unless such Claims have been specifically determined by the trier of the fact to be the sole negligence of Pulte." Each of the defendants later entered into one or more contractor project agreements with Pulte to perform subcontracted work at the homes at issue in the *Berg* litigation. It is undisputed the homeowners in the *Berg* litigation alleged damages arising out of, resulting from, or relating to each of the defendants' subcontracted work for Pulte, i.e., roofing, masonry, and painting work.

4

Pulte tendered its defense in the *Berg* litigation to each of the defendants, all of whom failed to respond to the tender and did not pay for any of the attorney fees and costs incurred by Pulte in the litigation. Pulte thereafter filed a cross-complaint against numerous subcontractors, including defendants.

Pulte also tendered its defense to St. Paul under policies issued to Groundbreakers Landscaping, Inc. St. Paul agreed to defend Pulte under those policies, subject to a reservation of rights. St. Paul paid a total of $193,137.68 to defend Pulte in the *Berg* litigation.

To recoup the amounts paid to defend Pulte, St. Paul filed a complaint in intervention in the *Berg* litigation. "St. Paul's operative complaint in intervention include[d], among other things, a first cause of action seeking a judicial declaration as to the duty of various subcontractors, including [defendants], to defend Pulte under the terms of the subcontract agreements entered into between those subcontractors and Pulte and a fifth cause of action for equitable subrogation asserting that St. Paul, by paying for Pulte's defense, became equitably subrogated to Pulte's rights under the contracts executed by the defendants in intervention."

In May 2017, the trial court considered various motions filed by the parties as to the complaint in intervention and ruled, pertinent to this appeal, that the "complaint in intervention would be bifurcated for trial" such that the trial court would first determine "whether St. Paul was entitled to equitable subrogation against the defendants in intervention" and, "[i]f the Court determined that St. Paul had a right to equitable subrogation, the amount of St. Paul's recoverable damages would then be tried before a jury in Phase II." The trial court further ruled that the language in the agreements between Pulte and each of the respective defendants "did not give rise to a right to recover attorney fees incurred in enforcing the subcontractors' defense obligation against Pulte."

In June 2017, the trial court held a bench trial to determine whether St. Paul was entitled to equitable subrogation. The trial court issued a statement of decision in December 2017. The court found each defendant had a contractual duty to defend Pulte in the *Berg* litigation because the homeowners alleged damages related to each of the defendants' scope of work at the project, and defendants breached that duty by failing to pay for any of the attorney fees and costs incurred by Pulte in defense of that action.[2] Next, the trial court found "St. Paul had proven all eight elements of its equitable subrogation claim as to costs incurred in defending Pulte Home Corporation against claims arising out of, resulting from, or relating to the work of each of the defendants in intervention."[3]

The court further found that St. Paul's "right of recovery is limited by the indemnity language in the contracts between Pulte and the defendants in intervention, such that each defendant in intervention is liable only for costs incurred in defending

---

[2] The trial court had previously granted St. Paul's motion for summary adjudication, determining that Vaca Valley Roofing, Inc. had a contractual duty to defend Pulte in the underlying litigation to the extent the homeowners made claims related to its scope of work.

[3] The eight elements are: " '[1] the insured suffered a loss for which the defendant is liable, either as the wrongdoer whose act or omission caused the loss or because the defendant is legally responsible to the insured for the loss caused by the wrongdoer; [2] the claimed loss was one for which the insurer was *not* primarily liable; [3] the insurer has compensated the insured in whole or in part for the same loss for which the defendant is primarily liable; [4] the insurer has paid the claim of its insured to protect its own interest and not as a volunteer; [5] the insured has an existing, assignable cause of action against the defendant which the insured could have asserted for its own benefit had it not been compensated for its loss by the insurer; [6] the insurer has suffered damages caused by the act or omission upon which the liability of the defendant depends; [7] justice requires that the loss be entirely shifted from the insurer to the defendant, whose equitable position is inferior to that of the insurer; and [8] the insurer's damages are in a liquidated sum, generally the amount paid to the insured.' " (*CBR Electric*, *supra*, 50 Cal.App.5th at p. 229.)

6

Pulte against the Claims arising out of, resulting from, or relating to its specific scope of work. If it were not so limited, the court would not find that St. Paul prevailed on its equitable subrogation claim because the seventh element, namely that justice requires that the loss be entirely shifted from the insurer to the defendant, whose equitable position is inferior to that of the insurer, would not have been satisfied. The basis of this determination is that the contracts entered into by each of the subcontractors limited their defense obligations to claims arising out of, resulting from, or relating to their specific scopes of work while the law imposes a duty to defend the entire action on St. Paul, as an additional insured carrier." (Citing *Presley Homes, Inc. v. American States Ins. Co.* (2001) 90 Cal.App.4th 571, 575.)

The claim next proceeded to a jury trial "to determine the amount of St. Paul's damages." The trial court explained, "[i]t will be up to a jury to determine the scope of each subcontractor's defense obligation and what, if anything, is owed by each subcontractor to St. Paul."

St. Paul introduced the testimony of an auditing expert relating to the fees it paid in defense of Pulte in the *Berg* litigation. The expert testified the following portions of the fees incurred by St. Paul in defending Pulte arose directly out of each of the subcontractor's scopes of work: $3,007.50 as to Vaca Valley Roofing, Inc.; $1,417 as to Norman Masonry, Inc.; and $3,170 as to Colorific Painting, Inc. She further testified that $8,098.35 related to the roofing category, and three roofing subcontractors performed the work at issue in the litigation. Finally, the expert testified $65,204.95 of the defense fees related to the mixed defense fees for things like attending settlement conferences or a mediation. Another witness testified the total amount St. Paul paid in defense of Pulte in the *Berg* litigation amounted to $193,197.68, but the expert witness testified she only saw invoices amounting to roughly $188,000.

The jury was asked to render a special verdict on several questions. The first question was: "Did St. Paul Mercury Insurance Company pay money to defend Pulte

7

Home Corporation against claims arising out of, resulting from, or relating to the work performed by each of the . . . subcontractors under their contracts with Pulte Home Corporation on the homes involved in the underlying action brought by homeowner plaintiffs?" The jury answered "Yes" as to each of the defendants. Second, the jury was asked to "state the amount of money you have determined St. Paul Insurance Company paid to defend Pulte Home Corporation against claims arising out of, resulting from, or relating to that subcontractor's work." The jury answered $7,200.11 as to Vaca Valley Roofing, Inc.; $3,585.03 as to Norman Masonry, Inc.; and $5,338.03 as to Colorific Painting, Inc. Third, the jury had to delineate any amounts included in the foregoing sums that were "also paid in defense of any other subcontractor." The jury responded the following amounts allocated to each of the defendants overlapped with other subcontractors: $4,192.61 as to Vaca Valley Roofing, Inc.; $2,168.03 as to Norman Masonry, Inc.; and $2,168.03 as to Colorific Painting, Inc.

In the third phase of the litigation, the trial court considered whether the setoffs and/or credits for prior settlements, if any, reduced the jury verdicts. The trial court reduced the jury verdicts as to each defendant by 41.42 percent as follows: Vaca Valley Roofing, Inc. from $7,200.11 to $4,217.82; Norman Masonry, Inc. from $3,585.03 to $2,100.11; and Colorific Painting, Inc. from $5,338.03 to $3,121.02.

St. Paul filed a timely notice of appeal.

## DISCUSSION

### I

### *Defendants' Right To A Jury Trial*

St. Paul asserts "[t]he only cause of action that proceeded to trial was equitable subrogation" and "[s]ince a claim for equitable subrogation sounds in equity, there is no right to a jury trial." In St. Paul's view, "the trial court erred by holding a bifurcated trial after having already found that St. Paul satisfied all eight elements of its equitable subrogation claim." St. Paul relies on *CBR Electric*, in which the appellate court

8

concluded no jury trial right exists in an equitable subrogation action like this one. (*CBR Electric*, *supra*, 50 Cal.App.5th at p. 242.)

Defendants argue the trial court appropriately submitted the damages question to the jury because St. Paul sought money damages for defendants' breach of their respective indemnity and defense obligations under the master agreements. As such, defendants believe St. Paul pled an adequate remedy at law in the form of money damages, entitling defendants to a jury trial on that issue.

We conclude the trial court appropriately submitted the question of breach of contract damages to the jury.

A

*Additional Factual Background*

The trial court issued a tentative ruling on the jury trial issue, as follows: "It would appear appropriate for the Court to entertain a Phase I bench hearing to determine if St. Paul has standing to bring this instant action. Then, if the Court determines that St. Paul does have standing, the matter would be tried to a jury. [¶] Here, the gist of the action is a breach of contract action claiming monetary damages rather than specific performance. St. Paul is seeking $60,637.68 by way of this action. In support of this ruling, the Court looks to St. Paul's trial brief re: the right to recover prevailing party attorney's fees as subrogated insurer wherein St. Paul states at page 3, lines 23-24, and continuing thereafter, 'St. Paul's subrogation claim is based on an allegation that the defendants breached their contractual obligation to defend Pulte in this action.' This concession supports that the graveman [*sic*] of St. Paul's complaint in intervention is breach of contract, thereby affording defendants a right to jury trial.

"In *Offer v. Superior Court of City and County of San Francisco* (1924) 194 Cal. 114, the Supreme Court determined that where a right of action to which an insurer was subrogated is legal, i.e., recovery of money for damages it suffered, it is enforceable at

9

law. And the fact that the complaint seeks declaratory relief or names the causes of action 'equitable' does not determine the nature of the action." (Italics added.)

At the hearing that followed, St. Paul argued there was "nothing to try to a jury" because the trial court determines whether there is a duty to defend and interprets the terms of the contracts, and "to get through those eight elements [of equitable subrogation], the Court already has to determine what [St. Paul's] damages are and that [such damages] should be shifted to the defendants." St. Paul agreed with the trial court that, "[i]f Pulte were here, the cause of action would be breach of contract" and "there would be a jury trial." But, in St. Paul's view, a jury trial was inappropriate because its claim was not the same as that which Pulte would assert against defendants and the court was disregarding several appellate cases specifically stating equitable subrogation is an equitable claim.

Vaca Valley Roofing, Inc. argued a bench trial was appropriate as to whether St. Paul is entitled to equitable subrogation and has standing to seek reimbursement from the defendants. Its counsel asserted, "then it's still a jury question as to the extent of the damages for which each of the defendants would be responsible." In the roofing company's view, "[t]he defendants in this case cannot be deprived of their right to have the jury make the determination on those issues which are jury questions simply because St. Paul is the intervener in asserting Pulte's right. It cannot be overlooked or ignored that St. Paul has no right independent of Pulte's contracts."

St. Paul responded by agreeing its "rights arise out of the subcontracts" and "the subcontracts say [defendants] have to defend any lawsuit, so all of the subcontractors had to defend the whole lawsuit." It asserted, however, the equitable subrogation claim is subject to a bench trial and "[t]he only issue that potentially could go to a jury would be [the] damages issue, and to do that, the Court would first have to interpret the defense agreements and make a determination as to what the scope of the defense obligation was for each subcontractor."

10

The trial court affirmed its tentative ruling. In response, St. Paul asked the court: "What does that mean? What are we going to try to a jury?" The trial court responded: "Well, that's another day. Another judge needs my courtroom for a completely separate matter. And we'll have pretrial conference and what have you right before all of that."

As explained *ante*, after the bench trial, the jury considered whether St. Paul paid money to defend Pulte against claims arising out of, resulting from, or relating to the work performed by each of the defendants and the damages to be allocated to each of the defendants in that regard.

B

*The Trial Court Did Not Err In Granting Defendants' Jury Trial Request*

We review de novo the trial court's ruling that defendants were constitutionally entitled to a jury trial. (See *Caira v. Offner* (2005) 126 Cal.App.4th 12, 37, fn. 17.) "It is well settled in California that there is no right to a jury trial in civil actions that are equitable in nature. It is only when issues of law are involved that the right to a trial by jury attaches." (*Meyer Koulish Co. v. Cannon* (1963) 213 Cal.App.2d 419, 430-431.)

As a matter of background, "[h]istorically, there were separate law and equity courts. [Citation.] The law courts dealt with ordinary property rights, debts, and trespasses and adjudicated disputes by live testimony before a lay jury. [Citation.] The equity courts dealt with ethical matters and adjudicated disputes by written testimony before a judge. [Citation.] The separate law and equity courts were merged, but the distinction between law and equity remains to this day. The right to a jury trial for civil actions is generally limited to those causes of action (and their analogues) that were historically triable in a court of law. [Citations.] Those causes of action that were historically tried to a judge remain triable to a judge today because it is thought that the exercise of equitable powers 'depend[s] upon skills and wisdom acquired through years of study, training and experience which are not susceptible of adequate transmission

11

through instructions to a lay jury.' " (*Hoopes v. Dolan* (2008) 168 Cal.App.4th 146, 155-156.)

To determine whether a claim is legal or equitable, a court looks to the "gist" of the action, understood as "the nature of the rights involved and the facts of the particular case." (*People v. One 1941 Chevrolet Coupe* (1951) 37 Cal.2d 283, 299.) "The legal or equitable 'gist' of the action is ordinarily determined by the mode of relief to be afforded, though the prayer for relief is not conclusive." (*Walton v. Walton* (1995) 31 Cal.App.4th 277, 291.) Money damages are ordinarily the earmark of a legal claim. (*Offer v. Superior Court*, *supra*, 194 Cal. at p. 121 ["[t]he right of action to which the insurer was subrogated being legal, that is, for the recovery of money for damages suffered, it is enforceable at law"]; *Raedeke v. Gibraltar Sav. & Loan Assn.* (1974) 10 Cal.3d 665, 672 [actions at law ordinarily seek money damages].) However, "[a]n action is one in equity where the only manner in which the legal remedy of damages is available is by application of equitable principles." (*Van de Kamp v. Bank of America* (1988) 204 Cal.App.3d 819, 865; see also *C & K Engineering Contractors v. Amber Steel Co.* (1978) 23 Cal.3d 1, 9-10 [no jury trial right in suit for damages because action was entirely based on the equitable doctrine of promissory estoppel].)

Turning to the issue at hand, "[s]ubrogation is the 'substitution of another person in place of the creditor or claimant to whose rights he or she succeeds in relation to the debt or claim.' [Citation.] 'In the case of insurance, subrogation takes the form of an insurer's right to be put in the position of the insured in order to pursue recovery from third parties legally responsible to the insured for a loss which the insurer has both insured and paid. [Citations.]' [Citation.] 'The subrogated insurer is said to " 'stand in the shoes' " of its insured, because it has no greater rights than the insured and is subject to the same defenses assertable against the insured. Thus, an insurer cannot acquire by subrogation anything to which the insured has no rights, and may claim no rights which

12

the insured does not have.' " (*Interstate Fire & Casualty Ins. Co. v. Cleveland Wrecking Co.* (2010) 182 Cal.App.4th 23, 31-32.)

"Usually, a general liability insurer that has paid a claim to a third party on behalf of its insured may have an equitable right of subrogation against (1) other parties who contributed to the harm suffered by the third party (joint tortfeasors) under an equitable indemnity theory, and (2) other parties who are legally liable to the insured for the harm suffered by the third party (such as by an indemnification agreement) under a contractual indemnity theory." (*Interstate Fire & Casualty Ins. Co. v. Cleveland Wrecking Co.*, *supra*, 182 Cal.App.4th at p. 32.) The second theory applies in this proceeding.

In our minds, an equitable subrogation action consists of two phases of relief -- entitlement and enforcement. In the entitlement phase, the question is whether the plaintiff's equitable position "is superior to the position of the party to be charged." (*Dobbas v. Vitas* (2011) 191 Cal.App.4th 1442, 1446.) More specifically, whether, under the circumstances presented in this case, an insurer (St. Paul) is entitled to equitable subrogation under the eight-element test such that the insurer (St. Paul) may stand in the shoes of its insured (Pulte) to pursue the rights held by the insured (Pulte) against third parties (defendants) under a contractual indemnity theory. Undoubtedly, this inquiry must be performed by the trial court sitting as a court of equity. (*Ibid.*; *Valley Crest Landscape Development, Inc. v. Mission Pools of Escondido, Inc.* (2015) 238 Cal.App.4th 468, 482.) The relief at issue in the entitlement phase is an insurer's ability to stand in the shoes of its insured. Once an insurer has established that it is entitled to equitable subrogation, the insurer may enforce its insured's rights against third parties.

In the enforcement phase, the question is whether the insurer prevails on the substantive claims asserted against the third parties, standing in the shoes of its insured. The right to a jury trial would depend on the legal or equitable nature of the claims asserted against the third parties. Here, St. Paul asserted Pulte's breach of contract claim against defendants. Defendants were thus entitled to a jury trial in the enforcement

13

phase. (*C & K Engineering Contractors v. Amber Steel Co.*, *supra*, 23 Cal.3d at p. 9 [action seeking recovery of damages for traditional breach of contract is an action at law in which a right to jury trial ordinarily exists]; *Raedeke v. Gibraltar Sav. & Loan Assn.*, *supra*, 10 Cal.3d at p. 671 [same].)

The two-phase concept of an equitable subrogation proceeding is supported by our Supreme Court's reasoning in *Offer*, as noted by the trial court. Although our Supreme Court did not in that case consider or decide the jury trial question before us, the court *did* distinguish between the equitable nature of subrogation on the one hand and the independent equitable or legal nature of the action to which the insurer asks to be subrogated on the other. In *Offer*, an insurance company paid its insured for damages caused by an automobile accident; the insurance company then sued the third party who caused the accident on a subrogation theory in a court of equity, seeking to recover damages arising from the accident. (*Offer v. Superior Court*, *supra*, 194 Cal. at pp. 116-117.) The defendant argued he could be sued only in a court of law, not a court of equity, because the cause of action to which the insurance company became subrogated was legal in nature. (*Id.* at p. 117.) Our Supreme Court agreed with the defendant. (*Id.* at p. 123.)

Our Supreme Court explained: "At first, subrogation was purely an equitable remedy not to be claimed at law. But the courts of law gradually grew to sustain actions founded on the doctrine of subrogation in cases *where the claim itself was cognizable at law.* [¶] The better view is that a court of law may deal with subrogation as it may with assignment, and *when the right of action to which a plaintiff asks to be subrogated is a legal right of action a court of law may treat a plaintiff who is entitled in equity to subrogation as an assignee and allow him to maintain an action of a legal nature upon the right to which he claims to be subrogated.* . . . Of course, if the cause of action to which he claims to be subrogated is an equitable one, he must sue in equity, and there can always sue in his own name." (*Offer v. Superior Court*, *supra*, 194 Cal. at pp. 120-121,

14

italics added.)  Our Supreme Court concluded that, in that case, "[t]he right of action to which the insurer was subrogated being legal, that is, for the recovery of money for damages suffered, [the action wa]s enforceable at law." (*Id*. at p. 121.)  "*The fact that the complaint prays that the court decree the insurance company to be subrogated to the rights of the insured does not determine the nature of the action*.  In essence the action against petitioner herein is a legal action and he is entitled to have such action tried in a court of law." (*Id*. at p. 123, italics added.)

We draw from the foregoing the premise that an equitable subrogation claim does not *in and of itself* cloak an insurer's subrogated cause of action against third parties in equity.  As our Supreme Court said, an insurer's equitable subrogation claim does not determine the nature of the underlying action to which the insurer seeks to be subrogated. (*Offer v. Superior Court*, *supra*, 194 Cal. at p. 123.)  In that vein, it seems anomalous to suggest that defendants' right to a jury trial depends on whether Pulte or St. Paul pursues the breach of contract action.  The right to a jury trial does not turn on the identity of the plaintiff; it turns on the nature of the claim asserted.  Indeed, as St. Paul acknowledged during oral argument before the trial court, had Pulte rather than St. Paul brought the breach of contract claim against defendants, defendants would have had a right to a jury trial.  We can conceive of no reason why the result would be different simply because St. Paul stepped into the shoes of Pulte.  To this point, we find a Colorado Supreme Court opinion persuasive.

In *DeWitt*, an insurer sought damages against third parties as a subrogee of its insured, who suffered injuries from a vehicle collision. (*American Family Mutual Ins. Co. v. DeWitt* (Colo. 2009) 218 P.3d 318, 320.)  The trial court submitted the claim to a jury. (*Ibid*.)  On appeal, the insurer argued, among other things, that the trial court erred in submitting the cause to a jury. (*Ibid*.)  The Colorado Supreme Court disagreed and concluded that, "[w]hile the act of subrogation has its roots in equity, . . . the presence of a subrogee party does not transform otherwise legal claims into claims in equity." (*Ibid*.)

15

The Colorado Supreme Court explained: "Once an insurance company enjoys [subrogation] rights, they 'stand in the shoes of the insured' for all legal purposes and may pursue any rights held by the insured subrogor. *If the insurance company, as subrogee, is allowed to pursue the legal claims of its subrogor, the mere existence of subrogation does not transform those claims at law into equitable actions.* In other words, a subrogated insurer 'has no greater rights than the insured, for one cannot acquire by subrogation what another, whose rights he or she claims, did not have.' " (*American Family Mutual Ins. Co. v. DeWitt*, *supra*, 218 P.3d at p. 323, italics added.)

Applying these principles, the Colorado Supreme Court said that, "rather than focusing on the existence of subrogation, we must evaluate the nature of the actual claims asserted by [the insurer] on behalf of [its insured] in order to determine whether the [third parties] were entitled to a jury." (*American Family Mutual Ins. Co. v. DeWitt*, *supra*, 218 P.3d at p. 323.) Because both claims the insurer asserted against the third parties were rooted in negligence and the insurer "was only entitled to pursue compensatory damages, which are legal, rather than equitable, in nature," the third parties were entitled to a jury trial. (*Id*. at p. 324.)

We agree with the Colorado Supreme Court's analysis. An insurer's entitlement to equitable subrogation does not transform its insured's legal claims against third parties into equitable ones. For this reason, we disagree with *CBR Electric*, upon which St. Paul relies.

The facts of *CBR Electric* mirror this case. St. Paul defended Pulte in the underlying construction defect action and then "sought reimbursement of defense costs under an equitable subrogation theory against six subcontractors . . . [who] had worked on the underlying construction projects and whose contracts required them to defend [Pulte] in suits involving allegations related to their work." (*CBR Electric*, *supra*, 50 Cal.App.5th at p. 224.) After concluding St. Paul was entitled to equitable subrogation (*id.* at pp. 230-241), the Fourth District Court of Appeal considered whether it could

16

determine the amount for which each defendant was liable (*id*. at pp. 241-243).  In that regard, three defendants asserted they were entitled to a jury trial on the issue of the monetary damages sought.  (*Id*. at p. 242.)

The *CBR Electric* court concluded that, "[a]s an initial matter, defendants are not entitled to a jury trial on the amount each owes St. Paul in subrogation." (*CBR Electric*, *supra*, 50 Cal.App.5th at p. 242.)  The court explained that equitable subrogation is a proceeding in equity and the relief sought depended on the application of equitable doctrines.  (*Ibid*., quoting *St. Paul Fire & Marine Ins. Co. v. Murray Plumbing & Heating Corp.* (1976) 65 Cal.App.3d 66, 72; *Fireman's Fund Ins. Co. v. Morse Signal Devices* (1984) 151 Cal.App.3d 681, 686; *American Motorists Ins. Co. v. Superior Court* (1998) 68 Cal.App.4th 864, 871.)  Thus, in the *CBR Electric* court's view, "it does not matter that St. Paul is seeking monetary damages and not a traditionally equitable remedy like declaratory relief.  If, as here, 'the action is essentially one in equity and the relief sought depends upon the application of equitable doctrines, the parties are not entitled to a jury trial.' " (*CBR Electric*, at p. 242.)

None of the cases relied upon by the *CBR Electric* court dealt with the nature of the right to a jury trial on the substantive claim asserted by the insurer against third parties *after* the trial court found the equities entitled the insurer to equitable subrogation. Two of the cases relied upon discussed the equitable nature of equitable subrogation in the entitlement phase of the analysis.  (*St. Paul Fire & Marine Ins. Co. v. Murray Plumbing & Heating Corp.*, *supra*, 65 Cal.App.3d at p. 72 [special defense of equitable subrogation is a matter of equity to be determined by the court]; *Fireman's Fund Ins. Co. v. Morse Signal Devices*, *supra*, 151 Cal.App.3d at pp. 686-688 [insurer was not entitled to equitable subrogation of any of the insureds' causes of action based on breach of contract or negligence].)

The portion of the third case relied upon by the *CBR Electric* court merely states the general proposition that when the relief sought depends on the application of

17

equitable doctrines, no jury trial right attaches. (*American Motorists Ins. Co. v. Superior Court*, *supra*, 68 Cal.App.4th at p. 871.) The relief sought in the enforcement phase of this proceeding -- i.e., breach of contract damages -- is not, however, dependent on the application of equitable doctrines. (Cf. *C & K Engineering Contractors v. Amber Steel Co.*, *supra*, 23 Cal.3d at pp. 9-10 [no jury trial right where suit for damages based entirely on equitable doctrine of promissory estoppel]; *Maryland Casualty Co. v. Nationwide Mutual Ins. Co.* (2000) 81 Cal.App.4th 1082, 1093-1094 [relief sought in equitable *contribution* action between insurers is equitable].) " 'The fact that equitable principles are applied in the action does not necessarily identify the resultant relief as equitable.' " (*Raedeke v. Gibraltar Sav. & Loan Assn.*, *supra*, 10 Cal.3d at p. 674, fn. 4.)

At bottom, but for St. Paul standing in the shoes of Pulte, defendants would have been entitled to a jury trial on the breach of contract claim. We can fathom no reason why defendants' right to a jury trial should be negated simply because St. Paul rather than Pulte pursued the breach of contract claim.

## II

### *Defendants Are Not Jointly And Severally Liable For The Mixed Defense Fees*

St. Paul asserts the trial court erred by failing to instruct the jury that defendants are jointly and severally liable for the mixed defense fees incurred in the *Berg* litigation. As we can best glean from St. Paul's confusing argument in support of this point, St. Paul asserts the trial court prejudicially erred in denying one of its motions in limine, rejecting one of its proposed special jury instructions, granting a special jury instruction proposed by defendants, and drafting the verdict form because, collectively, the court's rulings and actions resulted in the jury finding defendants only severally liable for a portion of the mixed defense fees. St. Paul further asserts the trial court "either failed to interpret the master agreements or failed to interpret them properly" with regard to its joint and several liability argument. (Capitalization and bolding omitted.) We conclude defendants are

18

not jointly and severally liable for the mixed defense fees and thus St. Paul has failed to prove any prejudicial error occurred.

Two appellate courts have considered the contractual duty to defend language at issue here and have disagreed with St. Paul's joint and several liability argument, as do we. (*CBR Electric*, *supra*, 50 Cal.App.5th at p. 224; *Carter v. Pulte Home Corp.*, *supra*, 52 Cal.App.5th at pp. 586-587.) For the reader's ease, we reiterate defendants each agreed, in their respective master agreements, to, among other things, indemnify and defend Pulte against "all liability, claims, judgments, suits, or demands for damages to persons or property arising out of, resulting from, or relating to [that defendant's] performance of the work under th[e] Agreement and any Contractor Project Agreement ('Claims') unless such Claims have been specifically determined by the trier of the fact to be the sole negligence of Pulte." This language plainly contemplates a subcontractor's indemnity and defense obligations shall pertain *to the work it performed for Pulte*.

In *CBR Electric*, like here, St. Paul sued several subcontractors under an equitable subrogation theory for reimbursement of the defense costs it expended in defending Pulte in an underlying construction defect action. (*CBR Electric*, *supra*, 50 Cal.App.5th at pp. 223-224, 226.) The master agreements in *CBR Electric* contained the same duty to indemnify and defend language at issue in this case. (*Id*. at p. 225.) The trial court found, among other things, that "subrogation was an all-or-nothing claim, meaning it required a shifting of the *entire* amount of defense costs (all $189,000) to [the subcontractors] on a joint and several basis and did not allow for an apportionment of costs among [the subcontractors]." (*Id*. at p. 227.) The trial court said " '[t]he issue in such a case is whether justice requires that *the entire loss* to be shifted from [St. Paul's] shoulders and onto the shoulders of the defendant[s],' " ultimately finding St. Paul was not entitled to equitable subrogation. (*Ibid*.) The appellate court disagreed. (*Id*. at p. 224.)

As to the joint and several liability issue, the Fourth District Court of Appeal determined "the trial court incorrectly concluded that a cause of action based in subrogation required it to shift the *entire amount* of defense costs St. Paul incurred in the construction defect actions to defendants, on a joint and several basis." (*CBR Electric*, *supra*, 50 Cal.App.5th at p. 224.) The court reasoned: "Under the principles articulated in *Crawford v. Weather Shield Mfg., Inc.* (2008) 44 Cal.4th 541 . . . *and the subcontracts at issue here*, [the subcontractors'] duty to defend the general contractor arose when the general contractor tendered its defense to them, and that duty covered the cost of defending claims related to their work. Under these circumstances, St. Paul is subrogated to the general contractor's entitlement to the *portion* of defense costs each defendant owed as a result of its duty to defend the general contractor. Because the general contractor could not recover the full amount of defense costs from any one of its subcontractors involved in the construction defect actions, neither can St. Paul." (*CBR Electric*, at p. 224, first italics added.)

St. Paul believes defendants' statement that the *CBR Electric* court " 'rejected St. Paul's argument that the subcontractors were jointly and severally liable for the mixed defense fees St. Paul incurred in "defending the case [against Pulte] in general" ' " is "a gross distortion of that court's decision." St. Paul asserts "the court of appeal made ***no ruling whatsoever*** as to whether the subcontractors in that case could be held jointly and severally liable for the 'mixed' fees." In its view, "the court simply remanded the matter to the trial court to 'determine the amount of defense costs to shift to each defendant.' " We disagree with St. Paul's characterization of *CBR Electric*.

The Fourth District Court of Appeal expressly said the trial court erred in finding that, if St. Paul was entitled to equitable subrogation, the subcontractors would be jointly and severally liable for the entire amount of the defense costs St. Paul incurred. (*CBR Electric*, *supra*, 50 Cal.App.5th at p. 224.) The appellate court explained that *Crawford* "and the subcontracts at issue here" imposed on the subcontractors a duty to defend

20

"claims related to their work" and, because Pulte "could not recover the full amount of defense costs from any one of its subcontractors involved in the construction defect actions, neither can St. Paul." (*CBR Electric*, at p. 224.) The court later reiterated: "Here, Pulte's recovery against [the subcontractors] is defined by the duty to defend in the subcontracts. That duty renders [the subcontractors] responsible not for the entire cost of defending the construction defect actions, but only for the costs of defending claims related to their work." (*Id.* at p. 231.) The Fourth District Court of Appeal thus undoubtedly determined the subcontractors could not be held jointly and severally liable for the defense costs St. Paul expended in defending Pulte in the underlying construction defect action based on the language in the master agreements.

The First District Court of Appeal recently agreed with *CBR Electric* as to the joint and several liability issue. In *Carter*, Travelers Property Casualty Company of America (Travelers) argued, among other things, that the subcontractors it sued for equitable subrogation were each jointly and severally liable for the cost of Pulte's defense -- the same argument asserted by St. Paul in this case and in *CBR Electric*. (*Carter v. Pulte Home Corp.*, *supra*, 52 Cal.App.5th at p. 577.) The master agreements at issue in *Carter* contained the same language regarding the subcontractors' respective duty to defend and indemnify Pulte as the agreements at issue in this case and *CBR Electric*. (*Carter*, at p. 575; *CBR Electric*, *supra*, 50 Cal.App.5th at p. 225.) "Traveler's position at trial rested in part on the assumption that [the subcontractors] were each similarly obligated to defend the entire case against Pulte despite their contracts with Pulte imposing a duty to indemnify and defend only claims related to the individual subcontractor's scope of work." (*Carter*, at p. 580.) The subcontractors argued "there was no basis to impose joint and several liability because there was no shared obligation to support doing so . . . , as each subcontractor had an obligation to defend Pulte only with respect to claims arising from its own scope of work." (*Id.* at p. 582.) The trial

21

court found, in part, the subcontractors could not be held jointly and severally liable for the entire cost of Travelers's defense of Pulte. (*Id*. at p. 583.)

The First District Court of Appeal agreed with the trial court's finding regarding Travelers's joint and several liability argument. The appellate court concluded, citing *CBR Electric*, the subcontractors "each assumed a contractual obligation to defend Pulte only with respect to claims involving their respective scope of work. Each [subcontractor's] liability was thus limited to a proportionate share based on its scope of work." (*Carter v. Pulte Home Corp.*, *supra*, 52 Cal.App.5th at pp. 586-587, citing *CBR Electric*, *supra*, 50 Cal.App.5th at p. 226.) The court explained: "Travelers's claim against [the subcontractors] is based on the assumption that a subcontractor contractually obliged to provide a defense for claims within its scope of work has the same obligation to provide a complete defense to the entire action. It cites no authority in support of this assumption, however, and the cases discussing the obligation involve, and therefore phrase the obligation in terms of, insurers. An insurer's duty to defend the entire action in which some claims are potentially covered and others are not (a 'mixed' action) derives from policy, not contract. [Citation.] Policy considerations applicable to an insurer's contract with its insured do not necessarily apply in the same manner to the contractual obligations of a subcontractor indemnitor to a general contractor indemnitee." (*Carter*, at p. 586.) The court further said, "[h]olding [the subcontractors] jointly and severally liable for the cost of Travelers's defense of Pulte would be completely inconsistent with the policy behind section 2782." (*Carter*, at p. 587.)

We find none of St. Paul's arguments on this issue availing. First, St. Paul relies on *DKN Holdings* for the proposition that "each party who undertakes the same contractual obligation is jointly and severally liable to the beneficiary of that contract." (Citing *DKN Holdings, LLC v. Faerber* (2015) 61 Cal.4th 813.) Defendants argue *DKN Holdings* "is factually distinguishable and not controlling." We agree with defendants.

22

In *DKN Holdings*, three lessors signed a lease with DKN Holdings, LLC on behalf of Evolution Fitness. (*DKN Holdings, LLC v. Faerber*, *supra*, 61 Cal.4th at p. 818.) The lease provided "that multiple parties who signed as lessors or lessees 'shall have *joint and several* responsibility' to comply with the lease terms," and the parties did not dispute that the three lessors were jointly and severally liable under the contract. (*Ibid*.) Our Supreme Court thus did not in *DKN Holdings* consider or decide when and how a contract gives rise to joint and several liability. Cases are not authority for propositions not considered. (*People v. Brown* (2012) 54 Cal.4th 314, 330.)

Further, to the extent St. Paul relies on the following passage in *DKN Holdings*, its reliance is misplaced: "[a]t common law, when multiple parties promised the same performance, they were presumed to be jointly obligated absent a clear indication otherwise." (*DKN Holdings, LLC v. Faerber*, *supra*, 61 Cal.4th at p. 820, citing *Farmers' Exchange Bank v. Morse* (1900) 129 Cal. 239, 243.) The common law referenced in *Morse*, provided " 'that several persons contracting together with the same party for one or the same act shall be regarded as jointly and not as individually or separately liable, in the absence of any words to show that a distinct as well as entire liability was intended to fasten upon the promisors.' " (*Morse*, at p. 243.) Here, defendants did not "contract[] together with [Pulte] for one or the same act" because their respective duties to defend pertained to their individual scope of work alone, as explained *ante*.

Second, St. Paul relies on sections 1659 and 1660. Section 1659 provides: "Where all the parties who unite in a promise receive some benefit from the consideration, whether past or present, their promise is presumed to be joint and several." And, section 1660 provides: "A promise, made in the singular number, but executed by several persons, is presumed to be joint and several." St. Paul quotes these statutes but fails to explain why or how these code sections apply to the agreements at issue here. St. Paul merely quotes the indemnity provisions and definition of "Claims" in the master

agreements and then concludes: "Accordingly, each defendant agreed to pay for all attorney fees incurred by Pulte in defending or investigating claims for damages arising out of, resulting from or relating to the defendant's performance of work under the subcontracts with Pulte." We fail to see and St. Paul fails to explain how defendants "unite[d] in a promise" or made the same promise to Pulte, executed by several persons, such that sections 1659 and 1660 apply.

Quite simply, each defendant entered into a separate master agreement with Pulte, whereby each agreed to indemnity and defense obligations pertaining to the work *that the individual defendant* performed for Pulte. There was no joint promise made by these defendants, nor did they unite in a singular promise to Pulte. We thus find sections 1659 and 1660 inapplicable.

Finally, St. Paul relies on an insurance case. (Citing *Buss v. Superior Court* (1997) 16 Cal.4th 35.) It argues that, "[a]lthough the case dealt with an insurer's right to seek reimbursement for defense fees not related to claims potentially covered by its policy, the California Supreme Court's analysis is instructive." We disagree, joining our colleagues in the First District Court of Appeal. As that court explained in *Carter*, "[a]n insurer's duty to defend the entire action in which some claims are potentially covered and others are not (a 'mixed' action) derives from policy, not contract. [Citation.] Policy considerations applicable to an insurer's contract with its insured do not necessarily apply in the same manner to the contractual obligations of a subcontractor indemnitor to a general contractor indemnitee." (*Carter v. Pulte Home Corp.*, *supra*, 52 Cal.App.5th at p. 586, citing *Buss*, at pp. 48-49.) "As the court explained in *Crawford*, '[t]hough indemnity agreements resemble liability insurance policies, rules for interpreting the two classes of contracts do differ significantly. Ambiguities in a policy of insurance are construed against the insurer, who generally drafted the policy, and who has received premiums to provide the agreed protection. [Citations.] In noninsurance contexts, however, it is the *indemnitee* who may often have the superior bargaining power, and

24

who may use this power unfairly to shift to another a disproportionate share of the financial consequences of its own legal fault.' " (*Carter*, at p. 586, fn. 9, quoting *Crawford v. Weather Shield Mfg., Inc.*, *supra*, 44 Cal.4th at p. 552.)

In its reply brief, St. Paul for the first time relies on several other Civil Code sections and secondary sources to argue the "Civil Code . . . provides that an obligation imposed on several persons, or a right created in favor of several persons, is presumed to be joint, and not several, except in certain special cases." It further asserts a case relied on by defendants as to the attorney fees argument discussed *post* supports its joint and several liability argument, attempting to apply the "common issue" apportionment principle with regard to a party's entitlement to a contractual attorney fee award to defendants' defense obligations. (Quoting *Yield Dynamics, Inc. v. TEA Systems Corp.* (2007) 154 Cal.App.4th 547, 577 [when a claim for which attorney fees are recoverable is joined with a claim for which they are not recoverable, "all fees falling *within* the [attorney fees] provision are recoverable, even if the activities on which the fees are predicated also supported the prosecution or defense of claims outside the provision" and "[t]he prevailing party is entitled to recover all expenses incurred in litigating ' "common issues" ' between covered and uncovered claims or defenses"].) These arguments present new theories in support of St. Paul's joint and several liability argument; theories not raised in its opening brief to give defendants an opportunity to respond. We decline to consider new theories raised for the first time in a reply brief. (*In re Groundwater Cases* (2007) 154 Cal.App.4th 659, 693 [arguments and authority raised for the first time in a reply brief are untimely, unfair to the opposing party, and are normally disregarded].)

We also note that, as to the "common issue" allocation argument, St. Paul did not present the argument in the trial court. In that regard, St. Paul fails to address the trial court's express statement that, if the allocation of fees were not limited in relation to each defendant's scope of work, "the court would not find that St. Paul prevailed on its equitable subrogation claim because the seventh element, namely that justice requires that

25

the loss be entirely shifted from the insurer to the defendant, whose equitable position is inferior to that of the insurer, would not have been satisfied. The basis of this determination is that the contracts entered into by each of the subcontractors limited their defense obligations to claims arising out of, resulting from, or relating to their specific scopes of work while the law imposes a duty to defend the entire action on St. Paul, as an additional insured carrier." Thus, had St. Paul presented the "common issue" allocation argument to the trial court and had the trial court agreed with St. Paul's argument, the trial court would have denied St. Paul's request for equitable subrogation.

St. Paul also for the first time in its reply brief asserts that, even if the duty to pay the mixed defense fees was a several obligation, there was no evidentiary basis for the jury to allocate a portion of those fees to 27 other subcontractors. We again do not consider this argument raised for the first time in a reply brief.

In conclusion, we join our colleagues in the First and Fourth District Courts of Appeal in concluding the master agreements between defendants and Pulte do not provide for joint and several liability as to the indemnity and defense obligations. St. Paul has thus failed to prove prejudicial error occurred.

III

*Prejudgment Interest*

A

*Additional Factual Background*

St. Paul filed a motion for prejudgment interest, which the trial court denied. The trial court explained: "Phase II was necessitated by the very fact that damages needed to be litigated and ascertained by a trier of fact, here, a jury, in order to ascertain their amount. Thus the Court finds Plaintiff's damages were not liquidated for purposes of awarding prejudgment interest and not subject to an award of prejudgment interest pursuant to Civil Code Section 3287(a). [¶] Likewise, the Court does not find it would be in the interests of justice to use its discretion to award prejudgment interest under

26

3287(b), where the Plaintiff in Intervention has taken a position all along that each subcontractor was liable for the full costs of Defense of Pulte, despite there being no evidence presented that the subcontractors' work was implicated in all of Pulte's damages. In fact, each subcontractor worked on a small number of homes, and the jury's verdicts of $3585-$7200 (possibly subject to reduction/set off or credits) highly suggest that the Plaintiff's insistence of recovery of the full costs of its defense of Pulte was not reasonable, and therefore, the Court would not be effecting substantial justice by imposing a discretionary award of prejudgment interest in these circumstances."

B

*The Trial Court Did Not Err In Denying Prejudgment Interest*

St. Paul challenges the trial court's ruling as to the application of section 3287, subdivision (a) only; it raises no argument as to the trial court's discretionary ruling under section 3287, subdivision (b). St. Paul asserts the trial court erred in finding its damages were not liquidated for purposes of awarding prejudgment interest and the trial court's ruling was inconsistent with its finding that St. Paul was entitled to equitable subrogation. In that vein, St. Paul explains the trial court "found at the conclusion of the bench phase that St. Paul had proven all eight elements of its claim for equitable subrogation, including the requirement that its damages be in a liquidated amount." Because "the invoices that would have been available to the defendants if they had agreed to defend Pulte contained all of the information necessary to perform the analysis conducted by [St. Paul's expert]," St. Paul believes its damages were a matter of mere calculation.

Defendants disagree. Defendants assert that when "the extent of damages is disputed and must be determined from conflicting evidence, damages are neither certain nor capable of being made certain by calculation." They assert several cases are instructive. (Citing *Iverson v. Spang Industries, Inc.* (1975) 45 Cal.App.3d 303; *Wisper Corp. v. Cal. Commerce Bank* (1996) 49 Cal.App.4th 948; *Polster, Inc. v. Swing* (1985)

27

164 Cal.App.3d 427; *National Union Fire Ins. Co. v. Showa Shipping Co., Ltd.* (9th Cir. 1995) 47 F.3d 316.) Defendants further point to the disparity between the amount St. Paul claimed against each of the defendants on a joint and several liability basis as compared to the amounts of the judgments entered against them. Defendants assert the discrepancy "further disproves certainty."

St. Paul responds that three of the cases relied upon by defendants concerned conflicting and disputed evidence as to the amount of damages, whereas the evidence on damages in this case was undisputed. Thus, in St. Paul's view, the cases are inapplicable.

We review the denial of prejudgment interest de novo. (*Union Pacific Railroad Co. v. Santa Fe Pacific Pipelines, Inc.* (2014) 231 Cal.App.4th 134, 198.) Section 3287, subdivision (a) provides prejudgment interest must be awarded to a party who is entitled to recover damages that are certain, or capable of being made certain by calculation, and the right to recover those damages is vested. If the statutory conditions are satisfied, the court must award prejudgment interest. "[I]t is clear the policy underlying the [certainty] requirement for prejudgment interest . . . is that in situations where the defendant could have timely paid that amount and has thus deprived the plaintiff of the economic benefit of those funds, the defendant should therefore compensate with appropriate interest." (*Wisper Corp. v. Cal. Commerce Bank*, *supra*, 49 Cal.App.4th at p. 962.) Conversely, "where a defendant does not know what amount he owes and cannot ascertain it except by accord or judicial process, he cannot be in default for not paying it." (*Conderback, Inc. v. Standard Oil Co.* (1966) 239 Cal.App.2d 664, 689-690.) "The test for determining certainty under section 3287[, subdivision] (a) is whether the defendant knew the amount of damages owed to the claimant or could have computed that amount from reasonably available information." (*Howard v. American National Fire Ins. Co.* (2010) 187 Cal.App.4th 498, 535.)

First, we find no merit in St. Paul's argument that the trial court's denial of prejudgment interest is inconsistent with its equitable subrogation ruling. In finding the

28

eighth equitable subrogation element met, the trial court explained: "The Court finds that the requirement that St. Paul's damages be liquidated only requires that the amount St. Paul paid is liquidated. St. Paul paid $193,137.68 for the defense of Pulte in the present action. [¶] It will be up to the jury to determine the scope of each subcontractor's defense obligation and what, if anything, is owed by each subcontractor to St. Paul." From the foregoing, it is clear the trial court found the eighth element met because St. Paul demonstrated it had paid Pulte's defense fees in the underlying litigation. Thus, St. Paul had incurred real and ascertainable damages, rather than theoretical damages. The trial court did not, however, decide whether the damages sought against *each of the defendants* were liquidated within the meaning of section 3287, subdivision (a).

Second, we conclude the trial court did not err in finding the damages sought against each of the defendants were not liquidated within the meaning of section 3287, subdivision (a). " 'Damages are deemed certain or capable of being made certain within the provisions of subdivision (a) of . . . section 3287 where there is essentially no dispute between the parties concerning the basis of computation of damages if any are recoverable but where their dispute centers on the issue of liability giving rise to damage.' " (*Wisper Corp. v. Cal. Commerce Bank*, *supra*, 49 Cal.App.4th at p. 958.)

Here, there was a dispute as to the *basis* of the computation of damages. St. Paul asserted the defendants were jointly and severally liable for the entire sum it paid in defense of Pulte. The defendants, on the other hand, asserted St. Paul had to prove the amounts pertinent to their individual scopes of work and, in that regard, the jury had to apportion the damages with respect to their contractual obligations. The jury did apportion the damages and awarded St. Paul *far less* than it sought against each of the defendants. (See *St. Paul Mercury Ins. Co. v. Mountain West Farm Bureau Mutual Ins. Co.* (2012) 210 Cal.App.4th 645, 665-666 [damages in equitable contribution case were not capable of computation for purposes of prejudgment interest because allocation of responsibility and hence the amount of contribution depended on the outcome at trial].)

" '[W]here there is a large discrepancy between the amount of damages demanded in the complaint and the size of the eventual award, that fact militates against a finding of the certainty mandated by [Civil Code section 3287].' " (*Wisper Corp. v. Cal. Commerce Bank*, *supra*, 49 Cal.App.4th at p. 961.)

Until the jury determined the allocation of the contract damages owed by each of the defendants, St. Paul's loss as to each defendant's breach of contract was not certain or capable of being made certain by calculation. Defendants thus could not review the invoices to calculate and determine the amounts they owed, as St. Paul asserts. The trial court accordingly appropriately denied prejudgment interest under section 3287, subdivision (a).

IV

*Attorney Fees*

"Attorney fees are not generally held to be the loser's obligation unless created by contract or expressly provided by statute." (*Jen-Mar Construction Co. v. Brown* (1967) 247 Cal.App.2d 564, 573.) "A contract may impliedly as well as expressly permit recovery of attorney fees in the event of suit to enforce the contract." (*Ibid.*) " 'If a cause of action is "on a contract," and the contract provides that the prevailing party shall recover attorney[] fees incurred to enforce the contract, then attorney[] fees must be awarded on the contract claim in accordance with Civil Code section 1717.' " (*Gil v. Mansano* (2004) 121 Cal.App.4th 739, 742.)

St. Paul requested attorney fees under paragraph 7, subdivision (b) of the master agreements between Pulte and each of the defendants, which provided: "Contractor shall be liable for all damages suffered by Pulte by reason of Contractor's *default in any provision of this Agreement or any Contractor Project Agreement*, and the exercise by Pulte of its option to terminate this Agreement shall not release Contractor of such liability. . . . As used in this Agreement, the phrase "**damages suffered by Pulte**" shall include by way of illustration, but not of exclusion, Pulte's Costs of completing

30

Contractor's work which exceed the Contract Price, interest charged by any construction lender during delays caused by Contractor, other general, liquidated or special damages, and Litigation Costs.  As used in this Agreement the phrase "**Litigation Costs**" shall include, but not be limited to, attorneys' fees, expert witness fees or professional opinion fees, costs of tests or analyses and all costs of suit, taxable and non-taxable, including, but not limited to, costs of deposition and trial transcript copies."  (Italics added.)

St. Paul asserts the trial court inappropriately rejected controlling authority from this court in finding paragraph 7, subdivision (b) does not provide for an award of attorney fees under section 1717.  (Citing *Citizens Suburban Co. v. Rosemont Development Co.* (1966) 244 Cal.App.2d 666.)  It states California "courts have held that a provision agreeing to pay all fees resulting from any default in a contract encompasses fees incurred to prosecute a contractual indemnity claim."  (Capitalization, bolding, and underlining omitted.)

In defendants' view, reading subdivision (b) of paragraph 7 in context with subdivision (a) of the same paragraph, "attorney fees are recoverable only due to a Subcontractor's default in the performance of work and/or failure to timely cure that occurs *during construction*" because Pulte's options in the event of a default "involve how and who will timely complete or repair the non-compliant work."  Defendants thus believe the attorney fees provision in subdivision (b) of paragraph 7 is inapplicable because "the default clause narrowly allows for attorney fees to be recovered only as 'litigation costs' when a subcontractor 'fail[s] to perform' the 'work' required under the subcontract agreements," with "work" meaning "the *construction tasks* outlined in the contracts."  Defendants principally rely on *Myers*.  (Citing *Myers Building Industries, Ltd. v. Interface Technology, Inc.* (1993) 13 Cal.App.4th 949.)

We do not agree with defendants that it is *clear* paragraph 7, subdivision (b) applies only to a subcontractor's default in the performance of its work during construction; we are, however, persuaded that both St. Paul's and defendants'

31

interpretations are colorable. We thus conclude the attorney fee provision in paragraph 7, subdivision (b) is ambiguous and must be read against the drafter and indemnitee. Accordingly, the trial court did not err in denying St. Paul's request for attorney fees.

A

*Factual Background*

The trial court denied St. Paul's request for attorney fees as follows: "Read as a whole, the Master Agreement does not contain a prevailing party attorney's fee clause applicable to St. Paul's claims. There is no standard or typical prevailing party language in the Master Agreement with the subcontractors which would ordinarily state a provision for recovery of attorney's fees by the prevailing party in any action to enforce the contract as between the general contractor and the subcontractors. [¶] The phrase 'Attorney's fees' is mentioned in section 7 of the Master Agreement, but it relates to Pulte's rights against the subcontractors in the event the subcontractors fail to timely perform their work under their specific scope of work contracts. The title for section 7 is 'Default and Remedies', since that is what is addressed in that section; the potential for default in performance by subcontractors and the corresponding remedy for their breach. The provisions indicate an intent by the general contractor and subcontractors to provide the general contractor with a remedy for the subcontractors' breach of their specific contracts, not an attorney's fees provision in the event of a later subrogation action such as this litigation.

"St. Paul stands in the shoes of Pulte, if they are subrogated to Pulte's rights under the Master Agreement, so St. Paul doesn't have a right to attorney's fees in this action. There is no claim in the current action that the subcontractors defaulted, as provided for in section 7 of the Master Agreement, so there is no basis for St. Paul to seek attorney's fees in this action." (Citing *Myers Building Industries, Ltd. v. Interface Technology, Inc.*, *supra*, 13 Cal.App.4th at pp. 969-970; *Pacific Tel. & Tel. Co. v. Chick* (1962) 202 Cal.App.2d 708, 719.)

32

B

*The Trial Court Did Not Err In Denying St. Paul's Attorney Fee Request*

Where, as here, the parties do not present extrinsic evidence to interpret the attorney fee provision, we determine de novo whether the contractual attorney fee provision entitles the prevailing party to attorney fees.  (*Gil v. Mansano*, *supra*, 121 Cal.App.4th at p. 743.)  " ' "To answer this question, we apply the ordinary rules of contract interpretation.  'Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. . . .  Such intent is to be inferred, if possible, solely from the written provisions of the contract. . . .  The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage" . . . , controls judicial interpretation. . . .  Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning.' " ' "  (*Ibid*.)

Section 1639 provides:  "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible; subject, however, to the other provisions of this Title."  "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity."  (§ 1638.)  "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."  (§ 1641.)  "If the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promissee understood it."  (§ 1649.)  A contractual provision "is ambiguous if it is capable of more than one reasonable construction.  [Citation.]  However, we will not strain the [contract] language to create an ambiguity.  [Citation.]  Moreover, we will not label a provision ambiguous simply upon isolating phrases and considering them in the abstract.  Rather, we must construe the provision in relation to the whole of the instrument, with each clause giving

33

meaning to the other." (*Continental Ins. Co. v. Superior Court* (1995) 37 Cal.App.4th 69, 82.)

If, after applying all other rules of interpretation a contract's language is determined to be ambiguous, then "the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist" -- i.e., the drafter. (§ 1654.) We further note "[a] standard attorney fee clause is really a contract of indemnity" (*Citizens Suburban Co. v. Rosemont Development Co.*, *supra*, 244 Cal.App.2d at p. 683) and contracts of indemnity are strictly construed against the indemnitee (*Heppler v. J.M. Peters Co.* (1999) 73 Cal.App.4th 1265, 1278).

We agree with St. Paul that paragraph 7, subdivision (b), read in isolation and standing alone, generally supports the notion that defendants are liable for attorney fees in a proceeding enforcing *any* breach or default of the contract, including the duty to indemnify and defend Pulte. The language in that subdivision is broad and, as St. Paul notes, *Citizens Suburban Co.* and *Continental Heller* could be read to support its interpretation.

*Citizens Suburban Co.* concerned an action by a water company against property subdividers for specific performance of a service agreement. (*Citizens Suburban Co. v. Rosemont Development Co.*, *supra*, 244 Cal.App.2d at p. 671.) The service agreement contained the following indemnity clause: " 'The Subdivider shall indemnify and hold the Utility harmless from any and all claims, demands, liabilities, losses, costs or expenses which it may suffer, incur or be put to by reason of the Subdivider's default under or non-compliance with the aforesaid covenants, representations and warranties.' " (*Id*. at p. 683, fn. 6.) This court explained the quoted phrase, " 'costs or expenses . . . by reason of the Subdivider's . . . non-compliance . . . ,' " "calls for payment of enforcement expenses occasioned by non-compliance. While broader than the standard attorney fee clause, there is no reason why it should not include the same kind of enforcement

34

expense, provided that the enforcement action is brought in good faith and is reasonably necessary." (*Id*. at p. 683.)

In *Continental Heller*, the court upheld an award of attorney fees incurred to prosecute an action to enforce an indemnity agreement because the contract "expressly provides for attorney fees incurred as the result of any breach of the contract." (*Continental Heller Corp. v. Amtech Mechanical Services, Inc.* (1997) 53 Cal.App.4th 500, 508.) The contract at issue in that case provided the subcontractor, Ralph Manns Company subsequently acquired by Amtech Mechanical Services, Inc. (Amtech), agreed to indemnify the contractor, Continental Heller Corporation (Continental), for " 'any and all loss, damage, costs, expenses and attorney's fees suffered or incurred *on account of any breach of the aforesaid obligations and covenants, and any other provision or covenant of this Subcontract*.' " (*Id*. at pp. 508-509.) The court explained this paragraph did not pertain to indemnity for attorney fees incurred in defending actions brought against Continental. That indemnity was covered in subparagraph (b) of the section, detailing "the obligation to indemnify Continental from all loss, damages, etc., 'including attorney's fees' which 'arises out of or is in any way connected with the performance of work under this Subcontract.' " (*Id*. at p. 508.) The court held the foregoing quoted italicized language instead "intended to entitle Continental to attorney fees in any action it brings against Amtech for breach of any provision of the contract including, but not limited to, breach of the indemnity provisions of subparagraph (b)." (*Id.* at p. 509.)

Although *Citizens Suburban Co.* and *Continental Heller* appear to support St. Paul's position, we note a material difference between the contractual provisions in those cases and the provision at issue here. The contractual provisions in *Citizens Suburban Co.* and *Continental Heller* included the attorney fees provision *within* the indemnity clause itself; thus, there was no speculation or question that the attorney fees provision applied to an action enforcing a breach or default of the indemnity (and defense) provision. Here, in contrast, and to defendants' point, the attorney fees provision St. Paul

35

relies upon was not included in the indemnity and defense provision of the contract. It is instead located in a different paragraph of the contract, one that contains several subdivisions.

Subdivision (a) of paragraph 7 provides that a subcontractor's breach of the agreement or failure to adequately perform during construction shall give Pulte three options. In simplistic terms Pulte's options generally pertain to getting the work done, corrected, or repaired in the event of a subcontractor's default. Subdivision (c) in the paragraph provides that Pulte may further use the subcontractor's materials, supplies, tools, or equipment to complete the work, eject the subcontractor from the construction site, or enforce any or all of the contracts the subcontractor has with its own subcontractors. Subdivision (d) provides: "[t]he options and rights granted to Pulte herein shall not be deemed as limitations upon the other rights and remedies of Pulte in the event of a failure of performance or breach by Contractor, and Pulte shall be entitled to exercise the rights and remedies hereinabove specific and all other rights and remedies which may be provided in this Agreement or by law or in equity, either cumulatively or consecutively, and in such order as Pulte in its sole discretion shall determine." Finally, subdivision (e) identifies two situations in which a subcontractor shall be deemed in breach of the agreement: bankruptcy or acts of insolvency, and delinquency in payment to an applicable employee fringe benefit trust.

Analyzing the meaning of subdivision (b) of paragraph 7 in the context of the other subdivisions contained in that paragraph, specifically subdivisions (a) and (c), we conclude defendants' interpretation is colorable that paragraph 7 deals with defaults and remedies with regard to the subcontractor's work performed during construction. Indeed, the illustration of the phrase "damages suffered by Pulte" in subdivision (b) of that paragraph pertains to Pulte completing the subcontractor's work. As such, we conclude the scope of the attorney fees provision in subdivision (b) is ambiguous and interpret the language of the provision against Pulte, the drafter and indemnitee. Read in that manner,

36

paragraph 7 does not specifically provide for attorney fees in an action on the contract as to all provisions. We thus conclude that, as to enforcement actions under subdivision (b) of paragraph 7, the attorney fees provision is limited to enforcement actions arising out of a subcontractor's failure to perform or inability to perform its obligations during construction. The trial court accordingly appropriately denied St. Paul's request for attorney fees.

## DISPOSITION

The judgment is affirmed. Defendants shall recover their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1)-(2).)

/s/_____
Robie, Acting P. J.

We concur:

/s/_____
Murray, J.

/s/_____
Renner, J.

37